The defendant in certiorari, William McVickar, as administrator of Archibald McVickar, dec., exhibited in the year 1807, in the Orphans’ Court of the county of Morris, -an account of his administration, and obtained an order for the sale of certain parts of the real estate of the decedent, for the payment of debts, for which the personal estate appeared to the court to be insufficient. Under this order he made sale *57 of four of the five parcels of land which he was authorized to sell, leaving the fifth parcel unsold. In December, 1825, the administrator exhibited a further account of his administration, shewing the amount of sales and the disposal of the moneys arising therefrom, alleging a subsisting deficiency of means to satisfy the debts of the estate, and praying ^another order for the sale of the other real estate left [*45 by the decedent. Against this account and the application for an order of sale, exceptions were made by one of the children and heirs at law of the deceased. After an hearing in July Term, 1826, a settlement of the account was made, a decree was passed for its allowance, and certain real estate was ordered by the court to be sold for the purpose of paying the balance which, according to the account, appeared to be due.
The account of July, 1826, and the order for sale, having been brought here by certiorari, a number of reasons have been assigned for setting them aside.
I. The first reason is, “ that the said Orphans’ Court in the said final account allowed and decreed sundry items alleged to be paid by the said administrator prior to March Term, 1807, of said Orphans’ Court, when his account was stated, and not included in that account.”
This objection is raised on the broad position, that no item omitted in the former account, no credit or matter of discharge, however just, which existed at the time the .first and partial account was exhibited and passed, and which was not therein included and allowed, can be made a subject ■of credit or allowance in the subsequent account. This position, in its full extent, is not sound. If by mistake, or other just and sufficient cause shewn to the court, an omission has taken place in an account thus exhibited, especially an account appearing on the face of it to be partial and not final, such omission may be corrected, and just allowance made to the administrator in his subsequent or final account. It is true, the court, when called on to make *58 such allowance, may and ought to require strong circumstances to excuse and explain the omission; but such circumstances being proved, the justness of the demand, and the reasons that no previous claim was made having been satisfactorily shewn, the court are not restrained by any rule of law or equity, or by any sound principle'relative to matters of account, from introducing and allowing the omitted items. On the contrary they are bound to do so. Even a final account is subject to correction, when mistake is proved to the satisfaction of the Orphans’ Court. Rev. Laws 787, section 32. I do not mean to say that section applies to the present case, but refer to it simply as a lead-*46] ing as well as *just principle. The very cases cited on the argument by the counsel of.the plaintiff,.while they shew a proper disposition in the courts not to intermeddle with or disturb, stated or settled accounts, carefully recognize the power so to do, when “something strong” or “ specific errors,” are “ distinctly charged ” and “ proved as specified.” In Perkins v. Hart, 11 Wheat. 256, Judge Washington, delivering the opinion of the Supreme Court of the United States, says, “ It surely cannot be contended that the settlemeut and discharge of an account for money lent and advanced for the use of the testator is a bar to a claim for commissions or of any other demand not included in the settled account.” Again — " The rule is the same in principle at law, a settled account is only prima facie evidence of its correctness. It may be impeached by proof of unfairness or mistake in law or in fact.” And again, “ The legal conclusion therefore insisted on by the defendant that the plaintiff is precluded from recovering in this action for the two items claimed to have been due before the two accounts spoken of, were rendered, is not correctly drawn, unless it appeared that those two items were included in what is called the account stated.” The particular grounds on which, in the present case, the allowance of these controverted items was made by the court, are not exhibited on *59 the account nor in the evidence laid before us. According to the doctrine in the State v. Mayhew, 4 Hals. 79, “ The decree is presumed right until the contrary appears either from the face of the decree or by such matter dehors the record as may be the proper subject of examination.
2. The second reason is, “ that the Orphans’ Court allowed the said administrator and decreed sundry sums of money without setting forth for or on what account the same were paid, and also sundry sums of money for which no receipts were produced, without setting forth, when paid, to whom or for what.”
To the first branch of this reason an answer is found in the ancient practice of the Orphans’ Court, long sanctioned by use, experience and convenience. The items of account are, almost necessarily, expressed in very general terms. A statement, if brief, would furnish no useful information, and if minute and in detail would swell the account to an enormous and at the same time useless and unprofitable bulk. Before the account can be passed or sanctioned by the court, all who are interested have the ^opportunity [*4.7 to examine if; and if suitable explanation is withheld or unsuccessfully sought, an exception to the account will require the accountant to sustain it by vouchers and proofs. In respect to the want of receipts, the feet on which the question is raised is not made out. It is not shewn that any item in the final account was allowed without the production of a receipt or other proper proof of its payment. On careful scrutiny I am unable to find any room for even an inference or presumption that any such allowance was made by the court. No one was particularly designated by the counsel on the argument.
3. The third reason is, “ that the Orphans’ Court allowed to the said administrator and decreed sundry sums of money for intere.st on money paid by the said administrator for and on account of the estate of the said deceased.”
The payment of the principal sums by the administrator, and the propriety of charging them in the account, are not, *60 as will be observed,.drawn into question. The interest only is the subject of objection. There is no rule of law or principle of equity sanctioned or adopted in our country, which unqualifiedly and under all circumstances, denies interest to an executor or administrator, upon moneys actually and in good faith advanced for the use of the estate. The cases cited by the plaintiff’s counsel do not establish such a general rule. Storer v. Storer, 9 Mass. 37, is very shortly reported and the facts under which the charge of interest was claimed and rejected, are not detailed. The court disallowed it, observing it was always in the power of an administrator to put himself in cash from the estate. Where such is the truth, the charge is doubtless improper. But the proposition appears to me to be stated with too much latitude. Instances often occur in which an administrator cannot put himself at his pleasure in cash, even by a sacrifice of the property. And oftentimes an advance by him is highly beneficial to the true 'interests of the estate. The case of Haviland v. Bowerbank, 1 Camp. 52, furnishes no rule for the present occasion. The subject under consideration was different. Interest on moneys received not on moneys advanced. Lord Ellenborough was seeking, as he says, to establish some fixed rule, where the determinations had been extremely capricious; and he laid down what he supposed the safe rule, at the same time admitting he had seen a suggestion to the contrary elsewhere. A *48] *charge of interest by an administrator will properly be viewed with caution and the circumstances offered to sustain it will be examined with scrupulous care. But circumstances may exist which will not barely justify, but commend an advance of money by the administrator and entitle him to an allowance of interest. Whether or not such c'ircumstanpes did actually 'exist in the present case, the Orphans’ Court had much better means to decide than we possess. We can see no legal principle which ha.s been violated by the determination they have made. On the *61 contrary it appears to have been called for by the proofs exhibited before them, so far as we have a view of them in the accounts and documents submitted to our examination. The personal estate early proved inadequate. A sale of part of the real estate was made and the proceeds applied towards the discharge of the debts. The sale of the residue of the real estate was postponed as the judges of the Orphans’ Court say, in the reasons given by them for their opinions, and which aro mado a part of the state of the case submitted to us, not “ by any contrivance of the administrator for his owm benefit, but by the particular circumstances of the estate, by the express consent of some of the heirs at law, after taking advice of counsel, and by the assent of all of them.” In the meantime, however, the debts of the estate were in some way to be paid. One of the creditors, and he the largest, was pressing for his money and about it the family was concerned, and especially the plaintiff in certiorari, and desirous to conceal it from her mother, which could only be done by preventing measures from being taken against the farm on which she lived, and to a portion of the profits of which she was entitled. The administrator may, therefore, well have been, as Jacob Eusli testified, the plaintiff and others of the family used frequently to say, he was, “ puzzled in settling the estate.” Under these circumstances, the administrator discharged the claims on the estate by the advance of his own moneys, or otherwise from his own resources, and in all respects acted as the Orphans’ Court say was satisfactorily proved to them, “ in good faith.” Had these debts remained unpaid, an arrearage of interest must have accrued upon them, in favor of the creditors. In Jones v. Williams, 2 Call, 102, an executor was allowed interest on a balance due him on the administration account. In Darrell v. Eden, 3 Dessass. Ch. Rep. 243, Chancellor Dessassure said, “ It is the course of the *court to allow interest on executors’ accounts, in their [*49 favor, when they appear to have been in advance for the estate.”
*62 I cannot see then, any rule of law or principle of j ustice, which has been violated by the allowance of interest made by the Orphans’ Court.
In the amount, however, of the interest allowed, or in other words in the time up to which the calculation was extended, I think the court'erred. All obstacle to the settlement of the estate was removed on the decease of the widow McVickar. The administrator should have then promptly proceeded. He had a decree remaining unexecuted for the sale of a certain portion of the real estate, and he might at once have made application for further sales if necessary. If he had promptly proceeded he might perhaps have been entitled to carry on the interest until the sales had placed him in funds. But he stood still when he might have advanced : — and the interest ought not to be allowed to accumulate during .a single hour of inexcusable neglect or delay. The Orphans’ Court allowed him one year’s interest from the decease of the widow, and this one year’s interest I deem an erroneous excess.
4. The fourth reason assigned, is, “ that the court decreed an allowance to the said administrator of a bond of the deceased to Abraham Cooper, taken up and paid at different times, or assumed to be paid; and because the said court allowed the interest on the said bond.”
The facts, that this bond was given by the deceased, was a just demand against him, and was paid by the administrator, are not questioned. The payment is alleged in the account, and no evidence is offered here, even if it were admissible, to shew the account incorrect in point of fact. What has already been said on the topic of interest in general is in a great measure applicable here and need not be repeated. More than the amount of the penalty does not appear to have been paid by the administrator; and the circumstances of the case fairly bring it within the exceptions to the general rule admitted to exist even by those authorities, which as a general rule, limit the recovery of interest to the amount of the penalty.
*63 5. 6. The fifth and sixth reasons were waived upon the argument.
*50] *7. The seventh reason is, “ that in 1807 the court granted the administrator an order to sell five tracts of land; that four only had been sold; and nothing appears to shew that the fifth tract remaining unsold, is insufficient to raise the sum requisite for the payment of the debts.”
On the other hand there is nothing to shew that the fifth tract is sufficient for the purpose. The act of the legislature directs the Orphans’ Court to order the sale of so much of the real estate as will be sufficient for the payment of the debts. In the present case the court have ordered the sale of other real estate besides the fifth lot, of the whole farm' whereof that lot is a parcel. As it is the duty of the court to ascertain and decide whether a sale of the whole is necessary, or whether the sale of part will suffice, wo are bound to presume in the absence of any proof to the contrary, that the sale of a part was insufficient for the required purpose, and of the whole was necessary. Perhaps, indeed, on certiorari, we are precluded from any enquiry into the facts decided by the Orphans’ Court, and concluded in that respect by their determination.
8. The eighth reason is, “ that the Orphans’ Court could not make the second order for sale, because the first order remained unexecuted.” The residue of this eighth reason as filed, not having been urged on the argument, needs not to be adverted to.
Assuming that the court had authority to make a second order for sale, which is to be examined under another head, the fact that the first order remained in part unexecuted formed no legal barrier to the exercise of this authority. The proper enquiry was in respect to the adequacy of the first order to the exigency of the case. Was the part thereby directed to be sold sufficient for the payment of the debts ? If not, to avoid hurtful delay, would alone have been a sufficient motive for promptly making the second *64 order. And an higher motive would probably be afforded by the prospect of more advantageously selling the farm entire, than in detached parcels. These were matters about which the court were bound to enquire, and according to the result to regulate their conduct.
The doctrine maintained by the counsel for the plaintiff' under this head, is that in respect to the real estate of a decedent, the Orphans’ Court can make but one order or *51] decree for sale. One *order being made, all power or authority of the court, they say, ceases.
There is nothing in the act of the legislature which so-circumscribes the power of the court; which either directly or indirectly imposes this limitation; and every motive of expedience and convenience forbids so rigorous a construction. In the letter of the act, there is not, it must be-admitted, any limitation of the authority of the court to a. single order. Nor is there any in the spirit of the act. The whole, if necessary, of the lands, tenements, hereditaments and real estate of the testator or intestate, are placed under the power of the court for the payment of the debts-The power then is not exhausted until on the one hand the whole estate is disposed of, or on the other, all the debts-are satisfied. The only anxiety in the legislature seems to-have been, that no more of the lands 'should be sold than-the payment of the debts would require; that part only should be sold if part would suffice; but their intention is equally clear, that the whole should be used if a smaller portion would not subserve the end in view. * A prudent and discreet execution of the duty confided to the Orphans’’ Court, may often render a second order of sale indispensable for the final settlement of the estate. The evident policy of the statute is to sell no more of the real estate than is strictly necessary. No more shall be sold, says the 24th section, than shall be necessary to pay the residue of the-debts. Governed by this policy, the court are to order apart only, and to specify the part, when in their judgment- *65 the sale of part will suffice. Now it often may happen, and it often has happened, that the part thus specified produces at public vendue, much less than was anticipated. The expectations of the court and of those interested in the estate are disappointed. A portion of the debts yet remains unsatisfied. When the object of the legislature is so plain, when the power of the court over the whole real estate is so clear, very explicit words or very palpable intent should be shewn to justify a construction which precludes any further act on the part of the court. The present case bears no analogy to those cases where a special power being given to a court or officer, has once been executed in its whole extent, and cannot therefore be subject to the same rules. Such were the cases cited on the argument by the plaintiff’s counsel. In the State v. Conover, 2 Halst. 218, upon certiorari, in matter of *road the Court of Common Fleas of the [*52 county of Monmputh had in April term, 1822, on the return of the surveyors, appointed freeholders for review; in July term, 1822, upon the return of their certificate, had set aside their appointment as incautiously made; in October term, 1822, had appointed six other freeholders; upon whose certificate coming in at a subsequent term, they caused the return to be recorded. The record of the return was vacated here. One of the members of this court was of opinion that the appointment of freeholders at October term, 1822, was irregular; the statute having directed the appointment to be made during the term next succeeding the entry of the caveat, an appointment at a subsequent term was without authority. Another concurred in setting aside the proceedings, but on a different ground, expressing no opinion on this head. And the other thought the proceedings were sufficiently regular. In Thatcher v. Powell, 6 Wheat. 119, which arose on a sale by a sheriff under an order of court made by virtue of the law's of Tennessee, for the payment of taxes, there was no second order or second sale. The case of Wheeler v. Wheeler, 1 Conn. Rep. 51, *66 ¡bears much more analogy tó the topic under examination, than either of the cases cited at the bar. A decree of the court of probate ordering a sale of real estate for the payment of debts, having been set aside on appeal, a subsequent decree was made for the same purpose, and was affirmed on appeal in the Superior Court and afterwards in the Supreme Court of Errors.
10. The tenth reason is, “ that the said Orphans’ Court made the said order to sell the said homestead farm, wholly or partly, to pay the balance due to the said administrator, whereas the said court have authority only' to sell to pay the debts of the said deceased; and because there were no debts of the deceased to pay.”
• As already mentioned the avails of the personal estate and of the real estate sold under the first order, were insufficient to discharge the debts. The residue was satisfied by the administrator to the creditors, either by his personal responsibility, or by actual payments out of his own funds. The reality of the debts and their payment by the .administrator are not indeed controverted either in the rea.sons filed or upon the argument at’the bar. The fact is abundantly shewn, not only by the account as stated under the *53] direction *of the Orphans’ Court, but in the abstract ■of the evidence which has been submitted to us. One of the witnesses testified that in the old lady’s life time, they, the plaintiff in certiorari, and others of the heirs, used to talk of the administrator having a claim upon the estate after the old lady’s death, for his paying money. Another testified, that Duncan McVickar said, when an attempt was made to ■settle, in November preceding the exhibition of the account to the surrogate, “ that 'he thought interest should be cast only up to his mother’s death.” “ It was not denied that the account was correct. The amount was only more than was expected.” He farther testified, that George Forsyth, acting for the plaintiff, and Duncan McVickar, stated the account and rejecting all the interest, made a balance due *67 •the administrator of five or six hundred dollars. He farther testified, that in 1820 or 1821, the plaintiff told him, “she thought the administrator had a pretty heavy demand against the estate, she did not know how he came to be so much in debt if he had not.” Another witness testified, Duncan McVickar told him he expected William, [the administrator,] had a claim against the estate, and that he embarrassed himself to pay the debts of the estate.” Moreover, the judges of the Orphans’ Court, in their reasons, say, “ It was satisfactorily proved they were debts which the deceased honestly owed, and which were paid by the administrator in good faith.”
How whether these debts remained due to the several •creditors, or whether they were paid to the creditors by the administrator from his own funds, they were still in truth .and substance the debts of the estate. To replace tho moneys which the administrator had advanced, would still be to pay the debts of the estate. Whether the sale was made to put him in funds to discharge the debts, or to reimburse him what he had actually paid, the object was the same, the payment of the debts; the limit was the same, the amount of the debts; and if good faith was preserved by tho administrator, the effect on the estate and on the interests of those concerned was precisely the same. The watchful eye of the court should overlook the conduct of the administrator, perhaps even with jealousy, when he claimed to have made advances, but if his motives were pure and the advances actually made in good faith, and under circumstances reasonable and prudent, a discharge of the debts by him to the creditors could work no such extraordinary *change as to preclude the application of the [*54 estate to the very same end, though in different hands, to which the policy of the law had subjected it. In Livingston v. Newkirk, 3 John. C. R. 318, Chan. Kent said, — “ If the personal assets prove deficient, and the executor pays •out of his own money to the value of the land, and the *68 Court of Chancery should direct the land to be sold, if' would certainly allow the executor to retain for his own indemnity.” In Murray v. Rottenham, 6 John. C. R. 62, the sanie Chancellor held that a trustee who had paid off' incumbrances on the estate with his own money, might look to the estate in the first instance for reimbursement. In Wheeler v. Wheeler, 1 Conn. Rep. 51, a decree of the Court-of Probate for the sale of real estate to pay debts, was made in the year 1800; the sale took place; and the creditors-were paid in full and gave receipts. On appeal the order under which the sale had been made, was afterwards set aside. In the year 1812, on another application, another order for sale for the payment of the debts was made; and having been affirmed on appeal by the Superior Court was brought by writ of error into the Supreme Court of Errors, where one of the reasons assigned for reversal was, that the debts against the estate having been paid, there was no authority in the Court of Probate to order a sale of land. Smith, J. in delivering the unanimous opinion of the court, said, “ If it were admitted that there were now no debts due to the former creditors, and that the moneys formerly paid them could not be recovered back, it would follow that the administrator would become the creditor, and the land ought to be sold to pay him.” In Bea v. Waggoner, 5 Hayw. 242, a bill was filed by an administrator stating payment of debts justly due from the intestate exceeding his personal estate, and praying sale of lands for satisfaction of the debts he had thus paid beyond the personal assets. The defendants, heirs, demurred and insisted, that the complainant had not paid at their request, and therefore could not have any demand against them ; he-could not have béen compelled to pay beyond the assets, and his voluntary payments to a greater amount ought not to turn him into a creditor against the real estate. The-court overruled the demurrer, and said, “ Had not the complainant-paid these surplus debts, the defendants would *69 be liable for them, and there is no injustice in saying he shall stand in the place of the creditors and resort to that property *for satisfaction 'which they would have [*5o resorted to; and being debts j ustly due from the intestate, his lands were liable to satisfaction for them.” In ex parte Allen, 15 Mass. 58, an application for the sale of real estate to reimburse the executor who has paid beyond the amount of the personal estate was refused, because, among other .things, it would serve to defeat titles made by the petitioner himself in the full exercise of his judgment and without any influence; but no doubt was raised of the power of the court to order a sale for such purpose; indeed, the power seems io be recognized by the court. In the cases cited by the •counsel of the plaintiff in certiorari, I do not find either precedent or principle to sustain this reason. Their industry and research, which I need not here either mention or applaud, have furnished no case where, on such ground, an order has been refused or repayment denied to an executor or administrator. The cases they cited respect constables .and sheriffs, and rest on very different principles. In Wooley v. Disberry, 1 Penn. 383; in Harris v. Champion, i South. 153; and in divers other cases, it was held that .a constable having an execution against-a defendant, cannot, without his request, pay off the demand and then maintain an action at law to recover of the defendant the amount thus paid. If paid at his request, the action may be maintained. Between these cases and that of an administrator honestly and in good faith advancing moneys, when not in funds, to discharge debts of the estate, the difference is too wide and obvious to need illustration. The cases of Reed v. Pruyn, 7 John. 426, and Sherman v. Boyce, 15 John. 443, were cited to prove that a sheriff cannot himself pay a plaintiff the amount of an execution and afterwards proceed io reimburse himself by a sale of the property of the defendant. It is not necessary to examine how far these cases .support this broad position. In both, the conclusion of the *70 court was rested on the liability to abuse, and the danger of oppression. I.n the latter case, the court said, “ to allow any man to wield the process of our courts in his own favor in order to exact such a measure of justice as he may think due to himself, would’not only lead to oppression and abuse, but would tend to subvert the foundation of private rights and of civil liberty.”, But however proper and sound this doctrine may be when applied to sheriffs, the very ground 'and reason of it is wanting in the case of an administrator, *56] He is not to wield the power of sale *in his own favor. He is not to exact such a measure of justice as he may think due to himself. Unlike the sheriff, between whom and the sale no impartial tribunal interposes, before the administrator can sell, he must ask the aid of a watchful court who will scrupulously examine his conduct, ascertain the existence of'the debts, enquire into his advances and the reason of them, restrain the amount of sales according to their judgment, direct what he shall sell, and control him in almost every efficient step!
In this reason then, I do not find any ground to disturb the decree for sale.
11. The eleventh reason is, “ that it appears by the accounts of the said administrator, that all, or nearly all, the debts of the deceased, and claims of the said administrator, are barred by the statute of limitations.”'
It does not appear that these debts, or any of them, were barred at the time they were paid by the administrator. So' far as respects the original creditors then, there is no ground for this objection. Whether the lapse of time can prevail against the administrator, will depend on the question now to be examined; whether the present order for sale was applied for within reasonable and legal time, and the delay has been satisfactorily accounted for.
12. The twelfth reason brings this subject before us. Ii is, “ that the order for sale was not applied for within a reasonable time after the death of the said Archibald McVicker.”
*71 There is no limitation expressly made, no period expressly fixed by the legislature within which the order for sale should be applied for or made. Reflection and experience both teach the extreme difficulty of prescribing any fixed rule which would, in general, operate safely and justly. This lesson is more impressively taught by the very wide conclusions to which enlightened courts have been led. Thus, In Mooers v. While, 6 John. C. R. 378, Chancellor Kent inclined to think that in ordinary cases the executor or administrator ought to make his application within ono year after he has entered on the duties of his office. While in Ricard v. Williams, 7 Wheat. 119, Justice Story for himself, and the other justices of the Supreme Court of the United States, says, the reasonable time within which the power should be exercised, *ought to be limited to the same [*57 period which regulates rights of entry; fifteen years in the state of which ho was speaking. And in Gore v. Brazier, 3 Mass. 542, Chief Justice Parsons deemed in an analogous case, twenty years to be a suitable period. Our statute directs the application to be made “ as soon as conveniently may be.” A discretion is very properly, as it is very necessarily, confided to the Orphan’s Court. Each case-must, in some measure, depend on its own peculiar circumstances. A convenient time for one would for another be very inconvenient. The time reasonable, according to the situation of one estate, would, in another, be very unreasonable. This doctrinéis fully recognized by Chancellor Kent, even with the rigid rule he thought ought, to be imposed on the executor or administrator. In the case above referred to, after stating what in common cases he deemed a reasonable time, he admits of subsequent applications under peculiar circumstances, and with some reasonable causo for delay. And in another place he says : “ The judge of probates or surrogate, must be entitled to determine, in sound discretion, what is a reasonable time under the circumstances of the case. If he, the executor or administrator, *72 has been guilty of gross negligence, or palpable laches on these points, he is clearly not within the meaning of these acts.” In the present case, I am strongly inclined to the opinion that we are concluded on this subject by the determination of the Orphans’ Court. Sitting here to review matters of law, not of fact, having very little concern with matters of mere discretion, I hesitate on the propriety of our interference, unless we discern the violation of some rule of law. Upon looking, however, into the circumstances of this case, I cannot say there has not been reasonable cause for delay, or that the administrator has been guilty of gross negligence or palpable laches. The farm, at- the decease of the intestate, was subject to a charge placed on it by the will of his father under which he held it. One room of the house, such as she chose, was given to his widow during her life. One of the upper rooms was given to his daughter Margaret, the present plaintiff, during her widowhood. The stock he bequeathed his widow, two cows, six sheep, and a mare and colt, were to be maintained by his son Archibald, both winter and summer, for her, upon the farm; and she was moreover to .*58] have one-third of *the profits arising from the farm during her life time. It is not necessary to say, whether the farm could, at all be sold before her decease. Unless subject to the charge, no one will pretend that it could be sold; and subject thereto, if any one could be found to purchase, it must surely have been at a very low price. This charge bore no resemblance to a -mortgage, to which it was likened on the argument. “ One third of the profits arising from the farm,” is the language of the will. The amount could by no process of calculation a priori be ascertained. How long the widow might live, and she did live after Archibald’s death for twenty years, and how long the. plaintiff might remain a widow and retain her room, and she is yet a widow, could not be foretold. How hazardous a speculation then must a purchaser have made ! W ho would have bid except a price proportioned to such hazard ? *73 Nor, I apprehend, could the administrator have sold off a part, and left sufficient to satisfy the widow, as was supposed on the argument; for of the profits arising from the whole farm, she was, according to the will, to have a share. Among the heirs of Archibald McVickar, but one opinion seems to have been entertained. It is true, no formal meeting was held, and instructions given to the administrator not to attempt a sale. But the opinion of all seems to have been, that a sale could not, or ought not, to have been made. The husbands of two of the heirs told one of the witnesses at an early period, that they had.consulted counsel, and were advised that nothing could be done with the place during the old lady’s life time. The plaintiff in certiorari herself, told one of the witnesses that nothing could be done with the place until the old lady’s death. These were all the heirs, except Duncan who had removed out of the state a number of years before the decease of his brother the intestate.
Under the consequences, flowing from all these circumstances, the conclusion of the Orphans’ Court seems a very sound one, that the administrator acted in perfect good faith, and especially when we see him, instead of selling the estate at all hazard, for whatever it might produce, and at any sacrifice, laboring to serve the interest of the heirs, exerting himself to provide for the debts out of his own resources, “ embarrassing himself to pay the debts,” as one of the heirs said, and in the language of another, “ puzzling himself to settle the estate.” In enquiring into the effect *of the lapse of time, it should also be remembered [*59 that the -whole real property remained in the hands of the heirs. Some transfers had been made among themselves, which will hereafter be noticed, but no part had passed from them into the hands of strangers.
13. The thirteenth reason is, “ that the order to sell the homestead farm includes lands of the deceased sold before the said order or decree was made by certain of the heirs to Margaret Liddel, the plaintiff.”
*74 From the deeds laid before us, it appears that John Vantuyl and Isabel his wife, who was one of the heirs of the-deceased, sold and conveyed on the 10th of June, 1825, her supposed share by inheritance, or one-fifth part, to Margaret Liddel, in consideration of $353, with covenants of" seizin, power to convey, freedom from incumbrances and' general warranty. On the 9tli of November, 1825, Duncan McVickar sold and conveyed to Margaret Liddel, for $640,-two-sevenths parts, his supposed share, with a special covenant that he had done no act whereby to change, alter or defeat the title. By two deeds, one of them dated 7th September, 1824, and the other on the 9th September, 1825, in> consideration of $408.64. William McVickar, the administrator, sold and conveyed to the said Margaret Liddel, two-seventh parts of the farm; the former deed containing the same covenants as in the deed of Vant.uyl; the latter a similar covenant to that in the deed of Duncan McVickar.
This reason rests upon the basis that the conveyances by the heirs, passed a valid title to their alienees; for otherwise no conclusion could be drawn that the conveyances-ought in any wise to impede the making by the Orphans’ Court of the solicited order. A question of title is then-necessarily raised by this exception before that court. Now it is clear that court has no power or authority to hold plea-of title, or to decide on the nature, -validity or effect of conveyances. It is moreover clear that an order of the-Orphans’ Court, 'and even a sale 'under it, would not destroy or disturb those conveyances, if legally made, or in-other words, if the heirs had right so to convey as to preclude a subsequent sale under the authority of the Orphans’" Court. In such case, if that court had entered into the-question of title, and pronounced the conveyances invalid,. *60] and made an order" for sale, the title of *t-he grantees-would not, from want of jurisdiction in the Orphans’ Court,, have been by such determination and decree destroyed. The result is, that the grantees in those conveyances, are- *75 left without prejudice, to stand on their legal and equitable-rights. And if by reason of their validity, the shares of other heirs be sold to pay the debts of the intestate, such heir or heirs will be entitled, under the provisions of the act of the legislature, to call for contribution.
These remarks apply to the conveyances of Vantuyl and wife, and Duncan McVickar. The sale and conveyance made by the administrator himself, present different considerations. The propriety of granting him an order for the-sale of the share already sold by him, or of including that share in the order for sale, does not turn on the question of title. This sale was made by him after he had discharged the debts of the estate, and thereby placed himself in the stead of the creditors, so that whatever afterwards was to he raised and paid out of the estate, was in truth to be paid to him. As heir, he sold this share of the real estate, lie thereby became answerable to the creditors to the value of the lands thus sold.’ Rev. Laws, 291, see. 2. But- he is himself the creditor. Being then the hand both to pay and to receive, the portion of the debt which this share of the land might otherwise be chargeable with, ought to be deemed extinguished, and an order ought not to be granted to him for the sale of it. If his original sale is valid, and would prevail against a sale made under an order of the Orphans’ Court, if such order were now granted, no injustice whatever is done to him in refusing him such order, as it would avail him nothing; and as he has already raised by sale, in another capacity, whatever the land should he-charged with, and the amount having been received by him, is already in the place where it ought to go if a sale were now to be made; if the original sale was not valid, but would be overruled by a sale under the order of the Orphans’’ Court, to refuse such order is to prevent the gross injustice which would he wrought by enabling him by a second sale, to place the value a second time in his own purse. In the case, ex parte Allen, already cited, the sale of real estate to- *76 reimburse the executor who had paid beyond the amount of the personal estate, was refused, among other reasons, because it would serve to defeat titles made by him in the full exercise of his judgment, and without any influence.
*61] *It appears to me, therefore, that the Orphans’ Court should not have included this share of land in the •order for sale, and should not have authorized the administrator to raise, by sale, the proportionate part of the amount of debts remaining unsatisfied.
14. The fourteenth reason is, “ that the court allowed beside the charge of court and surrogate’s fees on the settlement of the account, seventy-five dollars for the expenses •of the five judges for six days, and the counsel fees which were paid by the administrator to his counsel.”
In the former of these allowances, I think the court •erred. The expenses of the judges is utterly indefensible. Not a shadow of support for it can be found in any act of the legislature; I am aware that in some parts of the state instances have occurred and perhaps for a long time, in which, at special courts, the expenses of the judges or a fixed allowance for them, have been borne by the parties, yet I presume in all cases, by express agreement. And perhaps these instances may be defended on the maxim, ■volenti non fit injuria; but such charge can never be imposed on any party against his consent, so long as it is utterly destitute of legal sanction. To the allowance of the fees paid to counsel I find no sufficient objection. Although some alterations in the account were made by the Orphans’ Court, yet in the most material matters excepted to, the account was supported.
Having thus examined and disposed of all the reasons .assigned for setting aside the decree and order for sale, one interesting and important enquiry yet remains, what under the opinions expressed is to be done with them ? To reverse them entirely and send the parties back to commence a new •course of litigation, would, if any other legal measure can be adopted, be doing to them great injury. The proper *77 step on our part has not been distinctly marked out for us. A removal by certiorari is authorized, but no further regulation is made. It will not, I think, be hazarding much to express a conviction that the convenience of parties and the ends of justice might more readily and safely have been attained, if, instead of the remedy by certiorari, an appeal had been authorized to the Prerogative Court, where both law and fact might have been reviewed, and the account and decree so changed and new modeled, if necessary, as to carry out the wise designs of the legislature in the management, disposal and settlement of decedents’ estates.
*In the present case we have on deliberation, con- [*62 eluded we may lawfully and rightfully adopt the following course of proceeding. If the administrator thinks proper to remit the interest for one year, which is charged on the several items of account, subsequent to the balance struck on the 15th of September, 1809; and also two-seventh parts of the residue, being the proportion of the farm sold by- him as one of the heirs; and also the expenses of the judges— we shall order that the decree on the account and the order for sale as to the residue, be affirmed as to five-seventh parts of the real estate, and reversed as to the other two-seventh parts — being the part sold by him as heir; and without costs. If the administrator decline to make the remission above specified, we shall order that the decree and order for sale be entirely set aside and reversed.
Justice Drake did not sit in this cause, having been, while at the bar, of counsel with one of the parties.